**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------x

In re:

          DEWEY & LEBOEUF LLP, et al.,

                    Debtor.

----------------------------------------------------------------x

ALAN M. JACOBS, as Liquidating Trustee of
the Dewey & LeBoeuf Liquidation Trust,

                    Plaintiff,

         v.

DENNIS D'ALESSANDRO,

                    Defendant.

----------------------------------------------------------------x

NOT FOR PUBLICATION

Chapter 11
Case No. 12-12321 (MG)

Adv. Proc. No. 14-01919 (MG)

### MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S
### <u>MOTION TO DISMISS</u>

*A P P E A R A N C E S :*

DIAMOND McCARTHY LLP
*Attorneys for Alan M. Jacobs, Liquidating Trustee*
*for the Dewey & LeBoeuf Liquidation Trust*
909 Fannin Street, 15th Floor
Houston, Texas 77010
By:    Christopher R. Murray, Esq.

MILLER & CHEVALIER CHARTERED
*Attorneys for Dennis D'Alessandro*
655 Fifteenth Street, N.W., Suite 900
Washington, D.C. 20005-5701
By:    Barry J. Pollack, Esq.

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court is Dennis D'Alessandro's ("D'Alessandro" or the "Defendant") motion to dismiss (the "Motion," ECF Doc. # 18) the First Amended Complaint (the "Amended Complaint" or "Am. Compl.," ECF Doc. #15) filed by Alan M. Jacobs, as the Liquidating Trustee for the Dewey & LeBoeuf Liquidation Trust (the "Trustee"). The Trustee filed an opposition to the Motion (the "Opp.," ECF Doc. #21), and the Defendant filed a reply (the "Reply," ECF Doc. # 22). The Court heard argument on September 3, 2014.

D'Alessandro was the Chief Operating Officer ("COO") of Dewey & LeBoeuf LLP (the "Debtor" or "Dewey") from the firm's inception in 2007 until June 30, 2011, when D'Alessandro resigned as COO and entered into a consulting contract with the firm. D'Alessandro was not a partner in the firm. His contract contained a generous compensation structure and provisions that would deter Dewey from terminating him for any reason other than fraud or criminal conduct. The contract also contained a "poison pill" provision, providing that D'Alessandro was to be paid the full amount of his future compensation if Steven Davis was removed as Chairman of the firm. The Amended Complaint alleges that D'Alessandro's contract was so favorable that it must have been the product of negotiations that were not conducted at arm's-length. It also alleges that D'Alessandro was an "insider" of the Debtor, and the payments to him under his employment contract constitute preferential and fraudulent transfers.

The Trustee seeks to claw back years of payments to D'Alessandro. The Motion argues that (1) D'Alessandro was not an insider of the Debtor, (2) the challenged payments were made in the ordinary course of business, (3) the payments were made in exchange for legally sufficient consideration in the form of D'Alessandro's services as a Dewey employee, and (4) the Trustee is judicially estopped from trying to claw back payments before 2010.

As explained below, the Court concludes that the Amended Complaint alleges plausible claims for relief that are not barred, as a matter of law, by any of the affirmative defenses alleged by D'Alessandro.  Therefore, the Motion is **DENIED.**

## I.        BACKGROUND

### A.        The Debtor:  Dewey & LeBoeuf LLP

Before its bankruptcy filing on May 29, 2012 (the "Petition Date"), Dewey was a prestigious New York City-based law firm that traced its roots to the 2007 merger of Dewey Ballantine LLP and LeBoeuf, Lamb, Green & MacCrae LLP.  (Am. Compl. ¶ 8.)  Dewey was a registered limited liability partnership under the New York Partnership Law.  The firm was governed by the Dewey & LeBoeuf LLP Partnership Agreement ("DLPA"), effective as of October 1, 2007, and amended twice.  (*Id.* ¶¶ 9–10.)  At its peak, more than 1,400 lawyers worked at the firm in numerous domestic and foreign offices.  Hundreds of these lawyers— partners and associates alike—fled shortly before the firm collapsed.

After the bankruptcy filing, seven former employees, including the firm's Director of Finance, pled guilty to state criminal charges that allege systematic misstatements to partners and creditors about the firm's financial performance dating back to 2007.  Three of the most senior people at the firm have been indicted by a state grand jury, pled not guilty, and are awaiting disposition of very serious criminal charges.  The Liquidating Trustee has brought adversary proceedings against former partners and employees of the Debtor seeking to claw back transfers made before the bankruptcy filing.  This is one of those actions.

The Amended Complaint alleges that the financial woes of the firm date back to 2008 when the firm's revenues began to dramatically decline, overdue bills started to pile up, and a decrease in the firm's cash reserves resulted in the Debtor's undercapitalization.  (*Id.* ¶¶ 21–42.)

The Amended Complaint alleges that "the Debtor's liabilities exceeded the fair salable value of its assets at least from 2009 until the Petition Date." (*Id.* ¶ 43.) The accounting method used by the firm in preparing its financial statements did not reflect the net realizable value of its assets. (*Id.* ¶ 44.) As a result, while the balance sheets may not have reflected insolvency, the Amended Complaint alleges that the Debtor was, in fact, insolvent. (*Id.*) The financial statements allegedly overstated the salable value of certain assets that actually had no marketable value, and also understated liabilities by excluding obligations to retirees and lease obligations. (*Id.* ¶¶ 45–46.)

### B.       The Defendant's Relationship with Dewey

D'Alessandro was Dewey's COO; the Amended Complaint alleges that this makes him an insider. (*Id.* ¶ 50.) D'Alessandro was also the firm's third-highest paid administrator (*id.*), and he exercised authority over partner and associate billing rates, partner bonuses, new client matters, attorney compensation, payment agreements with retirees, writing-off bills to clients, capital allotments for Dewey's offices, discretionary discounts for clients, Dewey's collection of artwork, and lateral partner hiring decisions (*id.* ¶¶ 51–52). He regularly attended Dewey's executive committee meetings. (*Id.* ¶ 52.)

The Amended Complaint includes a chart showing that from 2008 to 2012, D'Alessandro was paid a salary much closer to the salaries of Dewey's Executive Director, Stephen DiCarmine, and Dewey's Chief Financial Officer, Joel Sanders, than to any of the Debtor's other administrative personnel. (*Id.* ¶ 55.) The DLPA gave Dewey's Chairman, Steven Davis, responsibility for day-to-day management of the firm's business, and Davis delegated some of that authority to D'Alessandro. (*Id.* ¶¶ 56–57.) D'Alessandro worked for Dewey from its

inception in 2007 until June 30, 2011, when he retired.  (*Id.* ¶ 82.)  After D'Alessandro retired,

he entered into a consulting agreement with Dewey.  (*Id.*)

### C.    D'Alessandro's Employment Contract

D'Alessandro signed an employment contract (the "Contract") with Dewey on or about

August 29, 2007.  (*Id.* Ex. A.)  The Contract provided that D'Alessandro would be paid no less

than a $900,000 base salary per year, with a guaranteed bonus of no less than $200,000 per year.

(*Id.* at Ex. A ¶ 2.)  He would also receive performance bonuses, and every year, Dewey would

deposit $200,000 into a trust established by D'Alessandro.  (*Id.* at Ex. A ¶¶ 2–3.)  Over the

course of the Contract's six-year term, Dewey was obligated to pay D'Alessandro $5.4 million in

salary, $1.2 million in contractual bonuses, $1.2 million in trust payments, and discretionary

bonuses, too.  (*Id.* ¶¶ 60–63.)  The Amended Complaint alleges that this compensation exceeds

the reasonably equivalent value of law firm administrator services that D'Alessandro provided,

so the Contract was outside Dewey's ordinary course of business.  (*Id.* ¶¶ 64–65.)

The Contract contained a "poison pill"—in the event Davis was removed from the

Chairman position, Dewey was to immediately deposit all remaining amounts payable under the

Contract into D'Alessandro's trust.  (*Id.* at Ex. A. ¶ 6.)  Additionally, if D'Alessandro's

employment were terminated for any reason other than fraud or criminal conduct against the

firm, or if he were required to relocate outside of New York City, Dewey would have been

obligated to pay D'Alessandro all remaining amounts payable under the Contract *plus* a payment

of "two (2) times the Employee's Highest Employee Compensation Package."  (*Id.* at Ex. A ¶ 5.)

The Trustee alleges that, putting the compensation aside, the terms of the Contract

indicate that the parties did not negotiate the Contract at arm's length or enter into the agreement

in the ordinary course of business.  For example, the Contract does not actually require

D'Alessandro to do any work—he could perform no work at all, but would be paid the full contract amount, as long as he did not perpetrate a fraud or crime against the firm. (Am. Compl. ¶ 70.) According to the Amended Complaint, Dewey did not review how other firms compensate employees in D'Alessandro's position, and it did not consider anyone else for the position. (*Id.* ¶¶ 71–72.)

### D. The Challenged Payments from Dewey to D'Alessandro

Dewey paid D'Alessandro the following compensation:  (1) in 2008, $919,698 in base salary, a mandatory bonus of $200,000, a discretionary bonus of $1,191,150, and a trust payment of $200,000 (*id.* ¶ 78); (2) in 2009, $900,000 in base salary, a mandatory bonus of $200,000, a discretionary bonus of $1,275,888, and a trust payment of $200,000 (*id.* ¶ 79); and (3) in 2010, $900,000 in base salary, a mandatory bonus of $200,000, a discretionary bonus of $900,000, and a trust payment of $200,000 (*id.* ¶ 80).

When D'Alessandro retired on June 30, 2011, he entered into a consulting agreement with Dewey that entitled him to receive $900,000 in base salary, a mandatory bonus of $200,000, and a discretionary bonus of $900,000 in 2011. (*Id.* ¶ 81.) Dewey also agreed to keep D'Alessandro on Dewey's medical plan after he retired, until he turned 65. (*Id.* ¶ 82.) Similar to his original Contract, the consulting agreement also failed to set forth D'Alessandro's responsibilities or duties in exchange for the compensation, bonuses, and benefits he was to receive. (*Id.*)

In total, Dewey paid D'Alessandro $3,619,698 in salary, $800,000 in mandatory bonuses, $4,267,138 in discretionary bonuses, and $600,000 in trust payments. (*Id.* ¶ 100; *see also id.* at Exs. B & C.)

### E.   The Trustee's Causes of Action

The Amended Complaint alleges five causes of action under the Bankruptcy Code and New York state law:

*First*, a claim to recover $1,162,500 (including $562,500 in contractual payments and $600,000 in discretionary bonuses) paid during the preference period (one year, and ninety days prior to the Petition Date) under sections 547 and 550 of the Bankruptcy Code. (*Id.* ¶ 88.) The Trustee alleges these were preferential transfers because they were paid on account of an antecedent debt under D'Alessandro's Contract, and D'Alessandro was a Dewey insider, whether statutory or non-statutory. (*Id.* ¶¶ 90–91.) The Trustee also alleges that the other statutory criteria regarding Dewey's insolvency are satisfied, and that D'Alessandro received more from the preferential transfers than he would have if Dewey had filed for bankruptcy before making the payments. (*Id.* ¶¶ 92–94.)

*Second*, a claim to recover constructively fraudulent transfers under sections 544 and 550 of the Bankruptcy Code, and New York Debtor and Creditor Law ("NYDCL") sections 277–78. (*Id.* ¶¶ 96–106.) The Amended Complaint alleges that Dewey (1) was insolvent or became insolvent as a result of the payments; (2) was engaged in business or a transaction, or was about to engage in business or a transaction for which it had unreasonably small capital; and/or (3) intended to incur or believed that it would incur debts beyond its ability to pay. (*Id.* ¶ 103.) It also alleges that when Dewey made the payments, it was balance sheet

7

insolvent, unable to pay its debts as they came due, and had unreasonably small capital in relation to its obligations. (*Id.* ¶ 104.) Additionally, the Amended Complaint alleges that the payments were not made in exchange for fair consideration and were not made in good faith because they were made by an insolvent partnership to an officer. (*Id.* ¶ 105.)

*Third*, a cause of action under 11 U.S.C. §§ 548(a)(1)(B)(ii)(I)–(III) and 550 for avoidance and recovery of constructively fraudulent transfers to D'Alessandro totaling $3,162,500 within two years before the Petition Date. (*Id.* ¶¶107–111.) The Amended Complaint alleges that Dewey did not receive reasonably equivalent value for the payments and that the transfers were made while Dewey was balance sheet insolvent, was unreasonably undercapitalized, and was unable to pay its debts as they became due. (*Id.* ¶¶ 109–10.)

*Fourth*, a cause of action under 11 U.S.C. §§ 548(a)(1)(B)(ii)(IV) and 550 for avoidance and recovery of constructively fraudulent transfers to D'Alessandro totaling $3,162,500 within two years of the Petition Date. (*Id.* ¶¶ 112–119.) The Amended Complaint alleges that none of these payments was made within the ordinary course of Dewey's business, Dewey did not receive reasonably equivalent value in exchange for the payments, (*id.* ¶ 116), and D'Alessandro was either a statutory or non-statutory insider (*id.* ¶ 117).

*Fifth*, a cause of action under 11 U.S.C. §§ 548(a)(1)(B)(ii)(IV) and 550 to avoid obligations that Dewey incurred as constructively

fraudulent transfers.  (*Id.* ¶¶ 120–126.)  The Trustee seeks to avoid any
unpaid salary, bonus, penalty, or indemnification obligations described in
the Contract, including the change in control penalty for Davis' removal
as Chairman.  (*Id.* ¶ 121.)  The Amended Complaint alleges that Dewey
incurred these obligations within two years of the Petition Date because
the events giving rise to the obligations, such as the removal of Davis as
Chairman, occurred in 2012.  (*Id.*)  The Amended Complaint alleges that
Dewey did not incur these obligations in the ordinary course of business
and did not receive reasonably equivalent value for the obligations.  (*Id.*
¶¶ 122–23.)  Additionally, D'Alessandro was either a statutory or non-
statutory insider of the Debtor.  (*Id.* ¶ 124.)

## F.    The Motion

D'Alessandro's Motion is supported by a declaration from his attorney, Barry J. Pollack
(the "Pollack Decl.," ECF Doc. # 20).  The thrust of the Motion is that D'Alessandro is neither a
statutory nor a non-statutory insider of Dewey and, therefore, the first, second, fourth, and fifth
claims cannot survive.  (Motion at 1, 9–18.)  In essence, D'Alessandro argues that he worked for
an insider, but he was not one himself.  (*Id.*)  According to D'Alessandro, he was not a Dewey
partner, he was not a voting member of Dewey's Executive Committee, and as COO, he was not
vested with inherent authority as the position was not mentioned in the DLPA.  (*Id.* at 9–13.)
Instead, D'Alessandro contends that he merely carried out tasks that the firm's Chairman, Davis,
delegated and assigned to him, and Davis could have revoked the authority to perform the tasks
at any time.  (*Id.* at 5, 11–13.)  D'Alessandro also argues that his compensation levels do not
determine whether he was an insider; his compensation only demonstrates that he was a

9

"valuable employee." (*Id.* at 15.) Alternatively, even if D'Alessandro was an insider when he was COO, he argues that he ceased being an insider when he retired in June 2011, and therefore the Trustee's first claim fails because 11 U.S.C. § 547(b)(4)(B) only applies to payments made within one year of the Petition Date, or May 28, 2011. (*Id.* at 17–18.)

The Motion also raises claim-specific arguments. With respect to Count I, which seeks to avoid preferential transfers, D'Alessandro asserts two affirmative defenses: (1) that each of the challenged transfers constituted a "contemporaneous exchange for new value" in the form of his services as an employee (*id.* at 19–20), and (2) the transfers were made to D'Alessandro in the ordinary course of business (*id.* at 20–22). As to the constructively fraudulent transfer claims in Counts II, IV, and V, D'Alessandro contends that the Trustee failed to sufficiently allege that D'Alessandro did not provide "reasonably equivalent value" in exchange for the challenged payments or that those payments were not made in the ordinary course of business. (*Id.* at 22–24.) With respect to the state law fraudulent transfer claim in Count II, D'Alessandro argues that the Trustee failed to plausibly allege that the transactions lacked good faith or that D'Alessandro did not provide "fair consideration." (*Id.* at 24.)

Finally, D'Alessandro seeks to invoke the doctrine of judicial estoppel to prevent the Debtor from clawing back payments made prior to 2010 due to prior statements made by the Debtor's professionals on the record. (*Id.* at 24–25.) D'Alessandro argues that the Debtor's professionals testified during the hearing in which the Court approved the Partner Compensation Plan that "there was strong evidence to support the assertion that the Debtor was insolvent in 2012, but insolvency would be more difficult to prove for 2011, and even harder for 2010." (*See* ECF Doc. # 538 at 23.) D'Alessandro argues that this statement is inconsistent with the

allegation in the Amended Complaint that the Debtor was insolvent "at least" as of 2009.   (*See*

Am. Compl. ¶ 43.)

### G.    The Opposition

The Trustee makes several arguments in opposition to the Motion.  *First*, the Trustee

argues that the Motion raises questions of fact that are not proper for resolution on a motion to

dismiss.  (Opp. at 1.)  *Second*, the Amended Complaint alleges sufficient facts that must be taken

as true at this stage of the proceeding.  (*Id.*)  *Third*, the Trustee argues that estoppel does not

apply because during the 2012 hearings, the Debtor's professionals made clear that the date of

insolvency was uncertain.  (*Id.* at 1–2.)

## II.    <u>DISCUSSION</u>

### A.    Standard on a Motion to Dismiss

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil

Procedure, made applicable here by Rule 7012 of the Federal Rules of Bankruptcy Procedure, a

complaint need only allege "enough facts to state a claim for relief that is plausible on its face."

*Vaughn v. Air Line Pilots Ass'n, Int'l*, 604 F.3d 703, 709 (2d Cir. 2010) (citing *Ashcroft v. Iqbal*,

556 U.S. 662, 678 (2009)).  "Where a complaint pleads facts that are merely consistent with a

defendant's liability, it stops short of the line between possibility and plausibility of entitlement

to relief."  *Iqbal*, 556 U.S. at 678 (citation and internal quotation marks omitted).  Plausibility "is

not akin to a probability requirement," but rather requires "more than a sheer possibility that a

defendant has acted unlawfully."  *Id.* (citation and internal quotation marks omitted).

Courts use a two-prong approach when considering a motion to dismiss.  *Pension Benefit*

*Guar. Corp. v. Morgan Stanley Inv. Mgmt.*, 712 F.3d 705, 717 (2d Cir. 2013) (stating that motion

to dismiss standard "creates a 'two-pronged approach' . . .  based on '[t]wo working principles'")

(quoting *Iqbal*, 556 U.S. at 678–79); *McHale v. Citibank, N.A. (In re the 1031 Tax Grp., LLC)*, 420 B.R. 178, 189–90 (Bankr. S.D.N.Y. 2009).  First, the court must accept all factual allegations in the complaint as true, discounting legal conclusions clothed in factual garb.  *See, e.g.*, *Iqbal*, 556 U.S. at 677–78; *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 124 (2d Cir. 2010) (stating that a court must "assum[e] all well-pleaded, nonconclusory factual allegations in the complaint to be true") (citing *Iqbal*, 556 U.S. at 678).  Second, the court must determine if these well-pleaded factual allegations state a "plausible claim for relief."  *Iqbal*, 556 U.S. at 679 (citation omitted).

Courts do not make plausibility determinations in a vacuum; it is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* (citation omitted).  A claim is plausible when the factual allegations permit "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citation omitted).  A complaint that pleads only facts that are "merely consistent with a defendant's liability" does not meet the plausibility requirement.  *Id.* at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  *Id.* (quoting *Twombly*, 550 U.S. at 555) (internal quotation marks omitted).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.* (citation omitted). "The pleadings must create the possibility of a right to relief that is more than speculative." *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008) (citation omitted).

### B.     Insider Status

Counts I, II, IV, and V of the Amended Complaint allege that D'Alessandro "was either a statutory or non-statutory insider of the Debtor."  (Am. Compl. ¶¶ 91, 117, 124; *see also id.*

¶ 105.) D'Alessandro asserts that he was neither a statutory nor a non-statutory insider of the

Debtor and therefore these claims cannot survive. The Court disagrees—the Amended

Complaint raises plausible claims that D'Alessandro was either a statutory or non-statutory

insider. The issue cannot be resolved on a motion to dismiss.

### 1. Statutory Insider Status

Courts recognize two types of insiders—statutory and non-statutory. For the former,

courts look to section 101(31) of the Bankruptcy Code. The only type of statutory insider

D'Alessandro could have been is a "person in control of the debtor." *See* 11 U.S.C. §§

101(31)(B)–(C).[1] The Code does not provide a further explanation of what constitutes a "person

in control of the debtor." The inquiry is fact-specific and can turn "on a case-by-case basis from

the totality of the circumstances . . . ." *In re Velo Holdings Inc.*, 472 B.R. 201, 208 (Bankr.

S.D.N.Y. 2012) (citing *CPY Co. v. Ameriscribe Corp. (In re Chas. P. Young Co.)*, 145 B.R. 131,

136 (Bankr. S.D.N.Y. 1992) (citation omitted)).

Although the definition of "insider" is to be flexibly construed, courts generally require

evidence of "actual management" or "extensive control." *Herbert Constr. Co. v. Greater N.Y.*

*Sav. Bank (In re 455 CPW Assoc.)*, No. 99-5068, 2000 WL 1340569, at *5 (2d Cir. Sep. 14,

2000) (unpublished decision). The purported insider must have "a controlling interest in the

debtor or . . . exercise sufficient authority over the debtor so as to unqualifiably dictate corporate

policy and the disposition of corporate assets." *Velo Holdings*, 472 B.R. at 208. In determining

---

[1]    The parties did not address whether Dewey, a limited liability partnership, should be considered a
"partnership" or a "corporation" under the Bankruptcy Code. This issue has been raised in other motions currently
pending before the Court. *See, e.g.*, Memorandum of Law in Support of Defendants' Motion for Partial Summary
Judgment ("Defendants' Brief") at 8–12 *Jacobs v. Marcoux (In re Dewey & LeBoeuf LLP)*, Adv. Proc. No. 13-
01687 (Bankr. S.D.N.Y. Aug. 12, 2014) (ECF Doc. # 16); Trustee's Response and Cross-Motion for Partial
Summary Judgment ("Trustee's Brief") at 17–20 *Jacobs v. Marcoux (In re Dewey & LeBoeuf LLP)*, Adv. Proc. No.
13-01687 (Bankr. S.D.N.Y. Sep. 2, 2014) (ECF Doc. # 21). For the purposes of this motion, whether Dewey is a
"partnership" or "corporation" under the Code does not affect the analysis whether D'Alessandro should be
considered an "insider." The definition of "insider" for both "corporations" and "partnerships" includes a "person in
control of the debtor." *Compare* 11 U.S.C. § 101(31)(B)(v), *with* 11 U.S.C. § 101(31)(C)(v).

whether there is sufficient "control," courts have considered the following factors:  "(1) control

over the debtor['s] voting stock; (2) managerial control, including personnel decisions and

decisions as to which creditors should be paid; [and] (3) whether the relationship between the

debtor and lender was the result of an arm's-length transaction."  *Official Comm. of Unsecured*

*Creditors of the Debtors v. Austin Fin. Servs., Inc. (In re KDI Holdings, Inc.)*, 277 B.R. 493, 512

(Bankr. S.D.N.Y. 1999).

     D'Alessandro asserts that the Trustee failed to allege that he had the requisite "control"

because he was not a partner or a voting member of Dewey's Executive Committee.  (Motion at

1, 4–5, 9, 15.)  Similarly, D'Alessandro argues that his position was not referenced in the DLPA

and he had no inherent authority arising out of Dewey's governing document.  (*Id*. at 1, 3–5, 9,

11–13.)  D'Alessandro contends that Davis, who was undoubtedly an insider, delegated duties to

D'Alessandro, but that such delegation did not make D'Alessandro an insider.  (*Id*. at 1, 4–5, 9,

13.)

     D'Alessandro argues that his position as COO, and the high compensation he received as

a "valued employee," is not sufficient to satisfy the pleading requirements for control.  (*Id*. at 9–

17.)  But the Amended Complaint alleges more than just that D'Alessandro was COO and was

paid a lot of money—it also alleges that D'Alessandro (i) controlled the Debtor's disposition of

assets by approving write-offs, giving discretionary discounts, executing payment agreements

with retirees, and selling the Debtor's artwork; (ii) set firm policy, including establishing partner

and associate billing rates and approving new client matters; (iii) controlled personnel decisions

by setting bonuses and compensation and approving lateral partner hiring; (iv) was placed in a

position to secure payment ahead of other creditors; and (v) was privy to critical information

about the Debtor's finances.  (Opp. at 3–4 (citing Am. Compl. ¶¶ 21–34, 53, 77–85).)  The

cumulative weight of these allegations is sufficient to state a plausible claim that D'Alessandro was an insider. While the Second Circuit has recognized that a delegation of certain managerial duties by an insider may lead to a finding of insufficient "control," it did not hold that *any and all* delegations by an insider necessarily precludes a finding of "control." *455 CPW Assoc.*, No. 99-5068, 2000 WL 1340569, at *5.

The Court concludes that the allegations in the Amended Complaint, which the Court must accept as true, support a "reasonable inference" that D'Alessandro was a "person in control of the debtor," sufficient to survive a motion to dismiss.

### 2. *Non-Statutory Insider Status*

Non-statutory insider status is generally evaluated using two factors: (i) "the closeness of the relationship between the debtor and the transferee," and (ii) "whether the transactions between the transferee and the debtor were conducted at arm's length." *Capmark Fin. Grp. Inc. v. Goldman Sachs Credit Partners L.P.*, 491 B.R. 335, 351 (S.D.N.Y. 2013) (citations omitted). Courts look to the "closeness between the transferee and the debtor, the degree of control or influence the transferee exerts over the debtor, and whether the transactions were conducted at [arm's-length]." *Id*. (citation omitted).

D'Alessandro argues that the Amended Complaint fails to allege that he had a "special relationship"—for example, the Amended Complaint does not allege, as the Trustee has alleged against other individuals (specifically, DiCarmine and Sanders), that D'Alessandro had a "close association" with Davis or that he had the ability to pay himself additional discretionary compensation or extend himself credit. (Motion at 13–15.) The Court disagrees, and concludes that the Amended Complaint sets forth more than just conclusory allegations demonstrating that a "special relationship" between D'Alessandro and the Debtor is "plausible."

15

For example, although DiCarmine and Sanders were Dewey's two highest paid non-partner administrators, D'Alessandro was a close third.  (Am. Compl. ¶ 55.)  D'Alessandro's salary was much closer to the salaries of DiCarmine and Sanders than to any of Dewey's other administrative personnel.  (*Id*. ¶ 55.)  The poison pill provision in D'Alessandro's employment contract suggests that he also had a special relationship with Davis, similar to DiCarmine and Sanders.  (*Id*. Ex. A ¶ 6.)  If Davis was removed from his chairman position, Dewey was obliged to immediately deposit all remaining funds under D'Alessandro's Contract into D'Alessandro's trust.  (*Id*.)  While the Amended Complaint does not explicitly state that D'Alessandro had a "close association" with the firm's chairman, the alleged facts are sufficient to support an inference that a special relationship between the two individuals existed.

In addition to demonstrating such a special relationship, these allegations, as well as others, suggest that the transactions between the parties may not have been made at arm's length. The Contract did not actually require D'Alessandro to do *any* work; rather, it required Dewey to pay the full contract amount as long as D'Alessandro did not perpetrate a fraud or crime against the firm.  (*Id*. ¶ 70.)  The Amended Complaint also alleges that, in drafting the Contract, Dewey did not review how other firms compensate similarly positioned employees.  Nor did Dewey consider or interview anyone other than D'Alessandro for the position.  (*Id*. ¶¶ 71–72.)

The four corners of the Amended Complaint support a plausible inference that D'Alessandro was a non-statutory insider.

D'Alessandro argues in the alternative that, should he be considered an insider, his insider status should be deemed to have ceased when he retired.  (Motion at 17–18.)  This argument is unpersuasive.  At least one other court has held that an insider's status does not necessarily cease upon that insider's resignation if the individual continues to exercise "control"

16

over the debtor. *Anstine v. Carl Zeiss Meditec AG*, (*In re U.S. Med., Inc.*), 531 F.3d 1272, 1278

(10th Cir. 2008). The Amended Complaint alleges that after the Defendant retired, he continued

to work for Dewey as a consultant. (Am. Compl. ¶ 82.) Under the consulting agreement,

D'Alessandro kept the same salary and bonus compensation structure for the remainder of 2011,

and he received extended medical benefits that provided additional or better coverage than he

had received under his original employment contract. (*Id*.)

Since "control" is a fact-specific inquiry and the subsequent consulting agreement

suggests a continuation of D'Alessandro's status and/or relationship with Dewey, the Court

concludes that the Amended Complaint plausibly alleges that D'Alessandro remained an insider

while he was a "consultant." The Motion to dismiss based on D'Alessandro's argument that he

was not an "insider" is **DENIED**.

### C.       Count I:  Section 547 Preferential Transfers

Count I of the Amended Complaint asserts a preference claim which seeks to claw back

compensation payments made to D'Alessandro under his employment contract. (Am. Compl

¶¶ 86–95.) Bankruptcy Code section 547 allows a trustee to avoid a transfer of a debtor's

interest in property to a creditor on account of an antecedent debt if (1) the transfer was made

while the debtor was insolvent, and (a) within ninety days before the petition date, or (b) in the

case of a transfer to an insider, between ninety days and one year before the petition date; and (2)

the transfer left the creditor better off than the creditor would have been absent the transfer if

forced to assert its claim in a chapter 7 bankruptcy. *See* 11 U.S.C. § 547(b).

The Motion argues that two affirmative defenses require dismissal of the claim as a

matter of law. (Motion at 18–22.) First, D'Alessandro argues that the compensation payments

upon which the Trustee's preference claim is based were "intended by the debtor and

17

[D'Alessandro] . . . to be a contemporaneous exchange for new value given to the debtor" and were "in fact [] substantially contemporaneous exchange[s]." (*Id*. at 19–20 (quoting 11 U.S.C. §§ 547(c)(1)(A)–(B).)  Second, D'Alessandro contends that the challenged employment-related payments were "made in the ordinary course of the debtor's and transferee's business or financial affairs;" or "made according to ordinary business terms." (*Id*. at 20–22 (quoting 11 U.S.C. §§ 547(c)(2)(A)–(B).)  The assertion of these affirmative defenses does not compel dismissal of Count I.

### 1.    *Contemporaneous Exchange for New Value*

For the contemporaneous exchange exception to apply, the exchange must meet three requirements:  "(1) the transferee delivered new value, (2) the parties intended the exchange to be contemporaneous, and (3) the exchange was, in fact, substantially contemporaneous." *Gowan v. Wachovia Bank, N.A. (In re Dreier LLP)*, 453 B.R. 499, 515 (Bankr. S.D.N.Y. 2011).  Here, the relevant inquiry is whether D'Alessandro provided "new value" in exchange for the challenged payments.

New value is defined in the Code as "money or money's worth in goods, services or new credit . . . but does not include an obligation substituted for an existing obligation."  11 U.S.C. § 547(a)(2).  Courts have interpreted this term to include the continued services of employees and payments to those employees may be construed as "contemporaneous" so long as the employer-debtor keeps current by paying the employees' salaries and benefits when due. *See Official Comm. of Unsecured Creditors of 360networks (USA) Inc. v. U.S. Relocation Services, Inc. (In re 360networks (USA) Inc.)*, 338 B.R. 194, 204–05 (Bankr. S.D.N.Y. 2005) (citing *Jones Truck Lines, Inc. v. Cent. States, Se. and Sw. Areas Pension Fund (In re Jones Truck Lines)*, 130 F.3d 323, 327 (8th Cir. 1998)).  The Motion argues that the compensation payments at issue here

were nothing more than current salary and benefit payments under the Contract in exchange for the "new value" in the form of D'Alessandro's continued services.  (Motion at 19–20.)  The Trustee argues that compensation payments under an employment contract raise only a rebuttable presumption of contemporaneous new value.  *See Official Comm. of Unsecured Creditors of Enron Corp. v. Whalen (In re Enron Corp.)*, 357 B.R. 32, 50 (Bankr. S.D.N.Y. 2006) ("While . . . contractually-agreed upon payments can generally be presumed to equal the value of the services (or goods) provided, sufficient facts [may] rebut that presumption.").  The presumption may be rebutted by evidence demonstrating that the employment or contractual arrangement was not negotiated at arm's length or that the payments were excessive as compared to the services rendered.  *See id.* (denying summary judgment because genuine issue of material fact existed concerning the services that former officer allegedly provided, for purposes of defendant's "new value" defense).

The allegations in the Amended Complaint (including allegations about D'Alessandro's allegedly excessive compensation) raise a plausible inference that the negotiations that resulted in D'Alessandro's Contract and subsequent consulting contract were not conducted at arm's length.  (Am. Compl. ¶¶ 55, 58–76.)  The Amended Complaint and the defenses asserted by D'Alessandro raise factual issues that cannot be resolved on a motion to dismiss.

### 2. *Ordinary Course of Business*

To make an ordinary course of business defense, a creditor "bears the burden of proving the defense[] by a preponderance of the evidence."  *Pereira v. United Parcel Serv. Of Am., Inc., (In re Waterford Wedgwood USA, Inc.)*, 508 B.R. 821, 827 (Bankr. S.D.N.Y. 2014).  The purpose of the ordinary course exception is to "discourage unusual action by either the debtor or his [or her] creditors during the debtor's slide into bankruptcy."  *Daly v. Radulesco (In re*

*Carrozzella & Richardson*), 247 B.R. 595 (2d Cir. BAP 2000) (quoting H.R. Rep. No. 95-595 at

373 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5787, 6329) (citations omitted).  To qualify as an

ordinary course transfer, the transfer must satisfy both a subjective and an objective test.

The "subjective element [] requires an examination of whether [the] transfer was ordinary

between the parties to the transfer."  *Pereira*, 508 B.R. at 827 (quoting *Daly*, 247 B.R. at 603).

Under this test, the court should consider:  "(i) the prior course of dealing between the parties,

(ii) the amount of the payment, (iii) the timing of the payment, (iv) the circumstances of the

payment, (v) the presence of unusual debt collection practices, and (vi) changes in the means of

payment."  *Id*. (internal quotation marks and citations omitted).  To support the affirmative

defense, the creditor "must establish a 'baseline of dealings'" that will enable the court to

evaluate the parties' prior practices and compare that with the transfers in question.  *Id*. at 828.

By contrast, the "objective test [] 'looks not to the specifics of the transaction between the debtor

and the particular creditor, but rather focuses on the general practices in the industry, in

particular the industry of the creditor.'"  *Id*. (quoting *Abovenet, Inc. v. Lucent Techs., Inc. (In re*

*Metromedia Fiber Network, Inc.)*, No. 04-08564A, 2005 WL 3789133, at *5 (Bankr. S.D.N.Y.

Dec. 20, 2005)).  In other words, the transfer "must comport with ordinary business terms used

by similarly situated debtors and creditors faced with similar circumstances."  *Official Comm. of*

*Unsecured Creditors of Enron Corp. v. Martin (In re Enron Creditors Recovery Corp.)*, 376 B.R.

442, 459 (Bankr. S.D.N.Y. 2007).  If the defendant fails to demonstrate that the challenged

transfers were in the ordinary course of business within the relevant industry, the defense, in

turn, fails.  *Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.)*, 78 F.3d 30, 43 (2d Cir. 1996)

(holding that defendant failed to adequately assert ordinary course defense by offering no

evidence of industry practice).  "The burden of proof to show industry practice, however, is on

the creditor who seeks to retain a payment at the expense of the other creditors." *Id.; see also Martin*, 376 B.R. at 459 (holding that objective test of ordinary course defense "requires evidence of industry practice apart from a debtor's own experience").

D'Alessandro relies solely on allegations in the Amended Complaint falling under the subjective test, arguing that they demonstrate "a prior course of dealing between the Debtor and Mr. D'Alessandro beginning in 2007" and continuing through his consultancy. (Motion at 20–22.) D'Alessandro fails to address the Trustee's allegations that the employment contract and consulting agreement negotiations did not conform to industry practice. (*See* Am. Compl. 71–75.) D'Alessandro cannot meet his burden of establishing the affirmative defense from the four corners of the Amended Complaint. D'Alessandro may ultimately prevail by establishing his affirmative defenses, but the Court cannot make that determination on a motion to dismiss. The Motion to dismiss Count I is **DENIED**.

### D.     Counts III, IV, & V:  Section 548 Fraudulent Transfers

Three of the Trustee's claims seek to avoid constructively fraudulent transfers under section 548(a)(1)(B) of the Bankruptcy Code. To recover under this section, a trustee must establish that the debtor made a transfer but received "less than a reasonably equivalent value in exchange." 11 U.S.C. § 548(a)(1)(B)(i). The trustee must also demonstrate that the transfer was made while the debtor (1) was insolvent or became insolvent as a result of the transfer; (2) was engaged in business or was about to engage in business for which any property remaining was an unreasonably small capital; (3) intended to incur or believed that it would incur debts beyond its ability to pay; or (4) made the transfer to or for the benefit of an insider under an employment contract and not in the ordinary course of business. 11 U.S.C. §§ 548(a)(1)(B)(ii)–(iv).

D'Alessandro's argument is two-fold.  He argues, first, that the fraudulent transfer claims should be dismissed for failure to adequately allege that the Debtor did not receive "reasonably equivalent value" in exchange for the challenged transfers, and, second, that the Trustee failed to allege that the transfers were not made in the ordinary course of business.  (Motion at 22–24.)

The question of reasonably equivalent value is based on the "facts and circumstances of each case" and requires the court to "compare what was given with what was received." *Estate of Ruffini v. Norton Law Grp. PLLC (In re Ruffini)*, Adv. Proc. No. 12-8396, 2014 WL 714732, at *7 (Bankr. E.D.N.Y. Feb. 25, 2014); *see also Harrison v. N.J. Cmty. Bank (In re Jesup & Lamont, Inc.)*, 507 B.R. 452, 470 (Bankr. S.D.N.Y. 2014) ("Whether the debtor received 'reasonably equivalent value' for the alleged fraudulent transfer is ordinarily a question of fact."); *Jackson v. Mishkin* (*In re Adler, Coleman Clearing Corp.)*, 263 B.R. 406, 466 (S.D.N.Y. 2001) ("[G]enerally[,] whether a transfer is for 'reasonably equivalent value' is largely a question of fact . . . .").  Courts consider "the good faith of the parties, whether it was an arm's length transaction, and what the debtor actually received." *Id.*

D'Alessandro asserts that the Amended Complaint provides mere conclusory allegations with respect to this element of the fraudulent transfer claims, suggesting that it was "missing . . . information as to why the value of such consideration was less than the amount transferred." (Motion at 23 (quoting *Liquidation Trust v. Daimler* (*In re Old CarCo LLC)*, 509 F. App'x 77, 78–79 (2d Cir. 2013) (internal quotation marks omitted).)  However, the Amended Complaint alleges that the Debtor did not receive reasonably equivalent value for payments under the Contract because the Contract payments were so exorbitant that they could not be justified by the services that D'Alessandro performed.  (Am. Compl. ¶¶ 60–64, 70, 76–85, 109, 116, 123.)  This

allegation is more than just a mirror image of the statutory elements and raises questions of fact that are inappropriate to resolve on a motion to dismiss.

The Trustee bears the burden of proof on the elements of the claim while D'Alessandro bears the burden of proof on the affirmative defenses.  On a motion to dismiss, the issue is whether the Trustee has plausibly pleaded facts supporting the claim; the allegations in the Amended Complaint satisfy the pleading requirements.  The Trustee has sufficiently pleaded both the subjective and objective prongs of the analysis.  The allegations that the Contract was not negotiated at arm's length or consistent with industry practice—supported by the allegations concerning out-sized compensation, termination and poison pill provisions—support a reasonable inference that the Contract and consulting agreement were not made in the ordinary course of business.  (*See* Am. Compl. ¶¶ 55, 58–76.)

Accepting the allegations as true, as the Court must do, the Amended Complaint plausibly pleads claims in Counts III, IV, and V.  Therefore, the Motion to dismiss those counts must be **DENIED.**

### E.      Count II:  NYDCL Sections 277–78 Fraudulent Transfers

D'Alessandro also moves to dismiss the Trustee's constructively fraudulent transfer claim brought pursuant to New York state law for failure to allege that the Debtor received less than "fair consideration."  Bankruptcy Code section 544 allows a trustee to stand in the shoes of an unsecured creditor who could set aside a fraudulent transfer under the NYDCL.  *See Savage & Assocs., P.C. v. BLR Servs. SAS (In re Teligent, Inc.)*, 307 B.R. 744, 750 (Bankr. S.D.N.Y. 2004) (citations omitted).

Here, the Trustee seeks to set aside certain payments to D'Alessandro under NYDCL sections 277 and 278.  NYDCL section 277 states that a conveyance of partnership property

made "when the partnership is or will be thereby rendered insolvent, is fraudulent as to

partnership creditors" if the conveyance is made (1) to a partner, or (2) "[t]o a person not a

partner without fair consideration to the partnership as distinguished from consideration to the

individual partners." N.Y. DEBT. & CRED. LAW § 277 (McKinney 2001).   NYDCL section 278

allows the creditor to set aside or disregard the conveyance. *See id*. § 278.

Neither D'Alessandro nor the Trustee addresses whether NYDCL section 277 applies to

limited liability partnerships registered under New York law or whether subsection (a) of 277

applies to their partners.   These issues were raised in other pending motions before the Court.

*See, e.g.*, Defendants' Brief at 12–20 *Jacobs v. Marcoux (In re Dewey& LeBoeuf LLP)* (Adv.

Proc. No. 13-01687); Trustee's Brief at 10–14 *Jacobs v. Marcoux (In re Dewey & LeBoeuf LLP)*

(Adv. Proc. No. 13-01687).   The Court does not reach these issues here.[2]

With respect to the issue of "fair consideration," "[t]o defeat a motion to dismiss, the

Trustee need only allege a lack of 'fair consideration' by pleading a lack of 'fair equivalent'

value *or* a lack of good faith on the part of the transferee."   *Gowan v. Patriot Grp., LLC (In re*

*Dreier LLP)*, 452 B.R. 391, 443 (Bankr. S.D.N.Y. 2011) (emphasis in original).   Courts use the

term "fair consideration" interchangeably with "reasonably equivalent value," relevant in

Bankruptcy Code section 548 fraudulent transfer claims, when examining constructive fraud

claims. *Ruffini*, Adv. Proc. No. 12-8396, 2014 WL 714732, at *7.   The only difference is that the

state law "fair consideration" also includes an examination of good faith—meaning that

"reasonably equivalent value" is essentially the same as "fair equivalent value."   *Id*.   As

indicated above, the Amended Complaint sufficiently alleges that the payments made to

---

[2]       Whether section 277 applies to LLPs may not be significant with respect to a claim against a non-partner
like D'Alessandro because "person[s] not [] partner[s]" are afforded a "fair consideration" defense under both
section 277 and section 273, the other avoidance provision addressing conveyances by an insolvent party. *Compare*
N.Y. DEBT. & CRED. LAW § 277, *with id*. at § 273.   If section 277(a) applies to partners of LLPs, those partners are
subject to a strict liability standard.

D'Alessandro by Dewey may not have been reciprocated with "reasonably equivalent value," subjecting the payments to potential avoidance under section 548 of the Bankruptcy Code. (*See* Am. Compl. ¶¶ 60–64, 70, 76–85, 105.)  Thus, the same can be said for the sufficiency of the "fair equivalent value" allegations.

The Amended Complaint also alleges a "lack of good faith" sufficient to satisfy the *Iqbal* and *Twombly* pleading standards.  It alleges that the transfers lacked good faith because they were made when Dewey was insolvent and were made to an insider.  (*Id.* ¶ 105.)  Some New York courts have held that transfers from insolvent debtors to insiders are "per se violative of the good faith requirement . . . ."  *Allen Morris Commercial Real Estate Servs. Co. v. Numismatic Collectors Guild*, No. 90 CIV. 264, 1993 WL 183771, at *9 (S.D.N.Y. May 27, 1993).  Other cases, however, have questioned the breadth of this presumption, only presuming bad faith where the transfers to the insider discharge antecedent debts for services previously rendered and do not offer any present value for the debtor.  *Bank of Commc'ns v. Ocean Dev. Am., Inc.*, 904 F. Supp. 2d 356, 361 (S.D.N.Y. 2012).  Transfers to insiders made, for example, in exchange for an asset sale at a fair price may also lack good faith, but an irrebuttable presumption or per se categorization would be inappropriate.  *See id.*  Given that the allegations of the Amended Complaint must be taken as true, the payments at issue do not fall within this second category of insider payments, but rather plausibly fall within the first category in which a "lack of good faith" may be presumed.  The Motion to dismiss is therefore **DENIED** with respect to Count II.

### F.    Judicial Estoppel

D'Alessandro lastly argues that the Trustee is estopped from seeking payments made to D'Alessandro before 2010 based on prior statements made by the Debtor's professionals on the record during the bankruptcy proceedings.  (Motion at 24–25.)  D'Alessandro argues that the

statements suggest that the Debtor admitted that it was not insolvent before 2010 and therefore

cannot claw back payments made before then. *Id.*

To invoke judicial estoppel, "(1) the party against whom it is asserted must have

advanced an inconsistent position in a prior proceeding, and (2) the inconsistent position must

have been adopted by the court is some manner." *In re Residential Capital, LLC*, No. 12-12020,

2014 WL 301974, at *7 (Bankr. S.D.N.Y. Jan. 27, 2014) (quoting *Peralta v. Vasquez*, 467 F.3d

98, 205 (2d Cir. 2006) (citations omitted); *see also Uzdavines v. Weeks Marine, Inc.*, 418 F.3d

138, 148 (2d Cir. 2005); *Bates v. Long Island R.R. Co.*, 997 F.2d 1028, 1038 (2d Cir. 1993)).

The doctrine requires "a true inconsistency between the statements in the two proceedings,"

*Residential Capital,* 2014 WL 301974, at *7 (quoting *Simon v. Safelite Glass Corp.*, 128 F.3d 68,

72–73 (2d Cir. 1997)), such that the statements evince "intentional contradictions, not just simple

error or inadvertence." *Id.* at *8 (quoting *Am. Nat'l Bank of Jacksonville v. FDIC*, 710 F.2d

1528, 1536 (11th Cir. 1983)).

Although the challenged statements were made on the record at a prior hearing, they were

part of a discussion regarding the insolvency of the Debtor—no date of insolvency was fixed or

adopted by the Court.  Subsequent developments—including the indictments of former senior

Dewey personnel—also strongly suggest that Dewey was insolvent at an earlier date than

previously assumed.  The allegations in the Amended Complaint provide room for discovery to

illuminate an appropriate date before which no transfer can be recovered.  (Am. Compl. ¶ 43

("Dewey's liabilities exceeded the fair salable value of Dewey's assets from *at least* 2009, and

continuously until the Petition Date.") (emphasis added).)  Consequently, the Defendant's

judicial estoppel argument is **DENIED**.

26

### III.   **<u>CONCLUSION</u>**

For the reasons stated above, the Motion to dismiss the First Amended Complaint is

**DENIED**.

   **IT IS SO ORDERED.**

Dated:  September 23, 2014
       New York, New York


                              _____*Martin Glenn*_____
                                 MARTIN GLENN
                         United States Bankruptcy Judge